UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| FREDERICK R. PAYNE, | : | |
| | : | Civil Action No. 02-5324 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **FINDINGS OF FACT &** |
| UNITED STATES OF AMERICA, | : | **CONCLUSIONS OF LAW** |
| | : | |
| Defendant. | : | |

**Appearances:**

    Gary F. Piserchia, Esquire
    Parker McKay P.A.
    Three Greentree Centre
    7001 Lincoln Drive West
    PO Box 974
    Marlton, New Jersey 08053-0974
        Attorney for Plaintiff

    Louis J. Bizzarri, Esquire
    U.S. Department of Justice
    United States Attorney
    District of New Jersey
    Camden Federal Building & U.S. Courthouse
    401 Market Street, 4th Floor
    PO Box 2098
    Camden, New Jersey 08101
        Attorney for Defendant

**RODRIGUEZ, Senior District Judge.**

    Plaintiff Frederick R. Payne ("Plaintiff") filed the Complaint in this matter alleging that Defendant United States of America ("Defendant"), through its doctors at the Veterans Medical Center ("VA Hospital") in Wilmington, Delaware, committed medical malpractice resulting from cataract surgery. Plaintiff has contended that the treating physician (1) failed to properly handle/manipulate the artificial lense, thereby allowing it to fall into the back of Plaintiff's eye; (2) malpositioned a second artificial

lens, an anterior chamber intraocular lens ("ACIOL"), thereby causing severe damage, inflammation, and "iris tuck"; and (3) failed to detect a causally related retinal detachment.[1]  Plaintiff's expert described the surgery as follows:

> [T]he intent of the cataract surgery was to remove the cataract from its natural location, which is behind the iris and in front of the vitreous cavity.  The way this is performed, the lens, . . . which is oval-shaped and has some depth to it.  And one can think of this almost like a fruit.  The fruit has a skin called the capsule.  The capsule can be divided into what we call the anterior capsule which sits in the front portion of the lens and this is the part that faces out, and then the posterior capsule which is the back skin of the lens.  In fact, this is one continuous skin, but since we manipulate the capsule during surgery, we break it into what's called the anterior capsule and the posterior capsule.  And then the substance of the lens, which is the fleshy part of the lens, we call the cortex, and the nucleus is contained within.
>
> [T]he type of surgery that was performed, what is known as a Phaco emulsification procedure, which is the dissolving of the natural lens using an ultrasonic probe and the removal of the dissolved lens, having liquefied it by an instrument called an aspirating  device.  This is done by tearing a circular opening in the anterior capsule, and this procedure is known as a capsule orexis, which is just Greek for tearing of the capsule.  This leaves behind this sac containing the cataract.  And when the cataract is dissolved and subsequently removed, there is what's known as the capsular bag, which is at this point a deflated sac consisting of the remaining posterior capsule of the lens.  The goal is to implant an artificial lens, an IOL . . . into this sac, this capsular bag which is the natural space of a lens inside the eye.
>
> In order for this to be successfully performed, the sac has to be intact.  The lens that is used consists of an optical part known as the optic and then two expandable hooks known as the haptics.  And the purpose of this is to secure the lens in place and allow the lens to be inserted through a relatively small incision.  The capsular sac is much larger than the optical portion of the lens, it's really only important that the optical portion of the lens be centered in the center of the sac so that the light coming through the pupil will also go through the lens.

---

[1]On December 2, 2003, the parties stipulated that defendants Department of Veterans Affairs, Peter Bzik, Gagan Singh, Scott Stiedel, Eric Jones, and Pranay Gupta be dismissed from this action.

The way this particular lens is secured is by having these bendable haptics, which when they are inserted into the sac then expand to secure the lens. And in order for this to secure itself, the capsular bag has to be reasonably intact. The way this lens is put in the eye -- there are different lenses these days. When this lens used to be a one piece lens where the optic was a firm material, it had to be inserted through an incision of a size at least big enough to accept the optic. These days more commonly a lens is inserted made of a foldable material, either silicon or acrylic, which allows the lens to be either folded in half and inserted or folded and rolled and then inserted through a shooter device, an insertion device, so it allows the incision to be half the size of the previous incision because the lens can be folded in half. And what typically occurs is that the lens is folded in half with an instrument called a folder. In this case, the lens was not injected into the eye through an injector, but it was placed into the eye with folding forceps. There are two forceps that are used. One is used to fold the optical portion in half.

Now, if we look at this picture, here is one haptic and here is the other haptic. The way the lens is folded in half is along this direction and the folding forceps will grab the optical portion of the lens. It will not grab either of these haptics. So, once the lens is folded in half, you have one haptic in front, which I believe in this case has been referred to as the leading haptic, and then you have a haptic behind where the forceps is and we can call it, using the terminology that was introduced in this case, as the lagging haptic, even though neither of those are really medical terms.

So, once that is folded, the lens contained in the forceps is inserted into the anterior chamber in an attempt to insert this into the capsular bag. Now, in order to achieve this, the lens has to be tilted because we have the incision here and the capsular bag sits below the incision, so it needs to be inserted on an angle.

Now, the haptic is flexible, so these can bend, these can bend both in the plane of the optic, they can also bend up and down. So when the lens is inserted in the incision, the leading haptic, which is not attached to the forceps but is in fact in front of it, is first inserted through the wound. And so that's free in the wound. And then this is followed by the folding forceps holding the intraocular lens.
Now, while this insertion is occurring, what was known as the lagging haptic is actually still outside of the eye because as the forceps is inserted, the forceps is holding the optical part and then the other haptic is sitting behind. Once the forceps holding the optic is inserted within the anterior chamber with the haptic still outside of it, the

3

>   forceps will then release the lens and then the optical part of the lens will then unfurl like a sail.
>
>   At this point the haptic is in the capsular bag, the optic is angling down into the capsular bag and the surgeon then takes the lagging haptic, which is outside the eye, picks it up with the forceps and then in a sense compresses the haptic and pushes down on the lens so that the lens will then be contained within this capsular bag.

(Tr. 38:21-42:19.)

Pursuant to 28 U.S.C. § 2402, this action was tried non-jury on April 19, 20, and 24, 2006. See 28 U.S.C. § 2402 (1996) (stating that ". . . any action against the United States under § 1346 shall be tried by the court without a jury . . ."). The following are the Court's findings of fact and conclusions of law.

### I.

1. Prior to undergoing cataract surgery, Plaintiff experienced blurred vision. Other than requiring glasses, no other problems, i.e., double vision, flashing lights, string-like objects, light sensitivity, and left eye weeping, were reflected in the record. (Tr. 38:4-9.)

2. Plaintiff underwent cataract surgery at the VA Hospital in Wilmington, Delaware on November 20, 2000, (Joint Final Pre-Trial Order, Stipulated Fact No. 1), to remove a cataract from his left eye, (Tr. 38:5-6).

3. Plaintiff's surgery was performed by Drs. Peter Bzik and Gagan Singh. (Joint Final Pre-Trial Order, Stipulated Fact No. 2.)

4. Defendant is vicariously liable for any liability, fault and/or negligence of the Department of Veterans Affairs, a/k/a Veterans Medical Center, a/k/a VA Hospital, a/k/a VA Medical Center, Regional Office Center and Drs. Peter Bzik, Gagan Singh, Scott Stiedel, Eric Jones and/or Pranay Gupta. (Stipulation of December 2, 2003.)

5. Capsule tear during cataract surgery does not constitute a deviation from the standard of medical care. (Tr. 36:22-25.)

6. Dr. Singh allowed the posterior chamber intraocular lens ("PCIOL") to sink into Plaintiff's eye. (Singh Tr. 78:15-79:11.)

4

7. The unnecessary and avoidable loss of an intraocular lens into the capsule of the eye is a deviation of the standard of care, (Tr. 37:1-3); however, the lens starts to fall into the capsular bag within a few seconds, which does not leave "a lot of time to try and save that from happening." (Tr. 336:18-25, 343:16-20).

8. There is no breach of the standard of care when, in advance of the placement of the intraocular lens ("IOL"), the surgical team tests the integrity of the capsule using a substance, such as helon, to expand the capsular bag, even though there is not a foolproof method to determine whether the bag is truly in tact. (Tr. 337:18-338:4).

9. Plaintiff's surgical team used helon to test the integrity of the capsular bag. (Tr. 337:23-24.)

10. It is within the standard of care not to remove a dislocated intraocular lens when the patient's vision is good and the patient is satisfied with his vision because "there is no reason to go taking additional risks if [you] already have achieved the endpoint of what might have been the goals of the original surgery." (Tr. 401:2-8.)

11. On December 11, 2000, Plaintiff visited the retinal clinic for an exam of his eye. (Tr. 269:19-25.) Dr. Steidl noted that there was no retinal detachment. (Tr. 271:20-22.) He also noted that the posterior chamber intraocular lens was "positioned where you might expect it to be." (Tr. 272:15-18.) In addition, he noted that his "visual acuity pinholed to 20/40, which in general terms is what we considered a best corrected vision." (Tr. 274:20-22.) Finally, he noted that Plaintiff "was essentially happy with (sic) the results of the surgery up to that point in time from a visual point of view, and that we were deciding, based on the finds and his subjective comments, including vision, that it was better to not undertake surgery at that time." (Tr. 275:2-7.)

12. On February 12, 2001, another eye exam was performed. (Tr. 277:1-7.) Dr. Steidl noted that the pupil was not distorted, which would have indicated either a problem with the iris or a problem with the vitreous coming into the anterior chamber. (Tr. 277:13-19.) He also noted that surgery to remove the posterior chamber intraocular lens was not necessary because Plaintiff's "vision was 20/20, excellent, he was happy with the vision, the eye looked to be in excellent shape, there [was] no damage to the retina, the intraocular lens was not in contact with the retinal surface, there were no retinal hemorrhages [and] no retinal detachments, no indication that there was an alteration in the vitreous structure that would put the retina at risk in any way." (Tr. 278:12-19.)

13. The risk of retinal detachment following cataract surgery where the capsule tears and the lens is dislocated is higher than it is with a torn capsule. The risk of retinal detachment following uncomplicated cataract surgery is one percent. The

    risk of retinal detachment following cataract surgery where the capsule tears is five percent.  The risk of retinal detachment following cataract surgery where the capsule tears and the lens is dislocated is six percent.  Therefore, eighty percent of retinal detachments following cataract surgery with a dislocated lens and torn capsule result from the torn capsule, while only sixteen percent result from the dislocated lens.  (Tr. 419-20.)

14. Plaintiff developed retinal detachment in his right eye, which "reinforces the idea that [Plaintiff] may have been predisposed to a retinal detachment." (Tr. 347:11-19.)

15. It is reasonable to implant an anterior chamber intraocular lens after a posterior chamber intraocular lens has fallen into the capsule.  (Tr. 92:20-25.)

16. Dr. Singh implanted an anterior chamber lens after the posterior chamber intraocular lens fell into the capsule.  (Tr. 49:19-20.)

17. A malpositioned anterior chamber lens can create iris tuck.  (Tr. 57:23-24.)

18. In February of 2003, Dr. Miller performed an eye exam, including a gonioscopy, which did not indicate any malpositioning of the anterior chamber intraocular lens.  (Tr. 348:6-10.)

19. Iris tuck only requires surgery when it is "of a high enough nature to make the benefit outweigh the risk of additional intervention."  (Tr. 405:1-3.)  Surgical intervention is not indicated when the iris tuck does not distort the pupil or cause the implant to be malpositioned.  (Tr. 404:15-16.)

20. Iris tuck was detected in Plaintiff's eye for the first time in 2004 by Dr. Sulewski. (Tr. 19-20.)

21. Plaintiff was seen by Dr. Nguyen on March 16, 2001.  (Tr. 351:17-22.)   Dr. Nguyen performed a scleral depression and noted no retinal detachment.  (Tr. 350:22-351:4.)

22. On March 26, 2001, Plaintiff was seen by Dr. Jones.  (Tr. 351:22-24.)  Dr. Jones detected a retinal detachment.  (Tr. 351:22-24.)

23. A retinal detachment with the macula attached only causes a peripheral field defect.  (Tr. 352:6-14.)

24. On March 30, 2001, Dr. Sulewski noted that Plaintiff's detached retina was "at the lower one quarter or so of the eye, ha[d] not approached the central 10 or 15 degrees of the retina, [and] had left . . . patient still with 20/25 vision." (Tr. 397:16-20.)

25.  A visual field test performed in July of 2003 indicated that there was no irreparable damage caused by any potential delay in diagnosis regarding the retinal detachment.  (Tr. 353:25-354-11; 399:3-9.)

## II.

Under Delaware law, a physician owes a duty of "reasonable care and diligence" to a patient.  18 Del. C. § 6801(c) (1998).  Medical negligence is defined as:

> any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient.  The standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed in the same or similar field of medicine as defendant, and the use of reasonable care and diligence.

Id.  A medical malpractice action generally may not be maintained unless expert medical testimony is presented to establish that (1) the services rendered were a "deviation from the applicable standard of care in the specific circumstances of the case"; and (2) the alleged deviation was the cause of the injury.  18 Del. C. § 6853(e) (2003).[2]

Once a plaintiff has established that a health care provider has committed medical negligence, he must prove that said negligence was a cause of his injury.

---

[2]The statute provides that expert medical testimony is not required:

> if a medical negligence review panel has found negligence to have occurred and to have caused the alleged personal injury or death and the opinion of such panel is admitted into evidence . . . .

18 Del. C. § 6853(e).  The statute further provides that:

> a rebuttable inference that personal injury or death was caused by negligence shall arise where evidence is presented that the personal injury or death occurred in any 1 or more of the following circumstances:
> (1)  A foreign object was <u>unintentionally</u> left within the body of the patient following surgery . . . .

Id. (emphasis added).

7

Delaware follows a traditional "but for" definition of proximate cause; therefore, "[p]roximate cause is a cause that directly produces the harm, and but for which the harm would not have occurred. A proximate cause brings about, or helps to bring about, the injury, and it must have been necessary to the result." Del. Pattern Jury Instructions Civil § 21.1 (2000). In addition, there may be more than one proximate cause of an injury and a negligent party may not "avoid responsibility by claiming that somebody . . . not a party [to the] lawsuit . . . was also negligent and proximately caused the injury." Del. Pattern Jury Instructions Civil § 21.2 (2000). Finally, a defendant takes his plaintiff as he finds him and is, therefore, liable for "all the resulting injuries to the plaintiff, regardless of the nature or severity of those injuries." Del. Pattern Jury Instructions Civil § 21.4 (2000).

### III.

Here, Plaintiff has failed to prove that Defendant breached its duty to provide Plaintiff with that degree of skill and care ordinarily employed in the same or similar field of medicine and did not use reasonable care and diligence. Plaintiff contends that Defendant breached the duty of care by (1) attempting to remove the posterior chamber intraocular lens; (2) malpositioning the anterior chamber intraocular lens; and (3) failing to timely diagnose the retinal detachment.

**1. Attempting to Remove the Posterior Chamber Intraocular Lens**

Plaintiff has failed to prove that the loss of the posterior chamber intraocular lens was "unnecessary and avoidable." The standard of care requires that the surgical team use a substance to test the integrity of the capsular bag, although there is no foolproof method to determine whether the capsule is truly in tact. Here, Plaintiff's surgical team

8

performed this operation. In addition, Dr. Singh's inability to gain or maintain control of the posterior chamber intraocular lens, which led to the loss of same, was not a deviation of the standard of care given that the loss of the lens happens so quickly and that the other standards were followed.

Moreover, Defendant did not breach the standard of care by not removing the dislocated intraocular lens. Plaintiff reported that he was satisfied with the results of the surgery. In addition, several of the examinations post-surgery indicated that the posterior chamber intraocular lens was well-positioned and there was no damage to the retina. Finally, given the relative health of Plaintiff's eye, the risks of additional surgery outweighed the benefit, if any, of removing the dislocated intraocular lens. Therefore, the presumption of negligence associated with unintentionally leaving a foreign object in the body of the patient is inapplicable, because the intraocular lens was not unintentionally left.

### 2. Malpositioning the Anterior Chamber Intraocular Lens

Plaintiff has failed to prove that the anterior chamber intraocular lens was malpositioned during the surgery on November 20, 2000. There are numerous examinations that indicate the anterior chamber intraocular lens was well centered. In addition, the gonioscopy performed by Dr. Miller, in February of 2003, more than two years after Plaintiff's surgery, indicates that there was no malpositioning. Moreover, iris tuck, the result of a malpositioned anterior chamber intraocular lens was counter indicated until 2004 because the pupil was round and normal in shape. Plaintiff has not proven by a preponderance of the evidence that the lens was malpositioned during the surgery on November 20, 2000.

### 3. Failing to Diagnose the Retinal Detachment

Plaintiff has failed to prove that even if Defendant did fail to timely diagnose the retinal detachment that such a failure resulted in any harm to him. First, any retinal detachment was minor because Dr. Nguyen did not detect it after a scleral depression. (Tr. 352:6-8.) Second, because the macula remained attached, the retinal detachment would only cause peripheral field defects. In 2003, Plaintiff presented no extraordinary defects after a visual field test. Therefore, assuming <u>arguendo</u> that Defendant failed to adequately diagnose the retinal detachment, Plaintiff suffered no damage as a result.

### IV.

Based on the foregoing, the Court finds that Plaintiff has failed to carry his burden with respect to all claims.

Accordingly,

**IT IS** this 29th day of September, 2006, hereby

**ORDERED** that judgement of **NO CAUSE FOR ACTION** be and the same hereby is entered in favor of Defendant and against Plaintiff.

                                               /s/ *Joseph H. Rodriguez*
                                               Joseph H. Rodriguez
                                               UNITED STATES DISTRICT JUDGE